My name is Shell Harrell for the Appellants. In this case, I think that what the mass of paper in this case comes down to, and it is a mass, is that the oral argument in front of the trial court, the trial court agreed with us that the officers at the time, the key acts were going on in this case, that they had grounds to be involved in a Terry stop. And the court's finding at oral argument came with good reason. The plaintiffs in this case, by their own admission, and this is the reason why we are here, not because of what we say, but what the plaintiffs say. Plaintiffs say that an officer pulled within six feet of the rear of them, bars had just let out at Hermosa Beach, officers will tell you that one of the concerns that they have when they do their job in Hermosa Beach is intoxication and fights in this area. And that's what they told the trial court. Even though the officer pulls up within six feet of the plaintiffs, their senses seem to be dull. They fail to move out of the way, so the officer sounds his horn, and at this point the plaintiffs turn and in unison begin cursing at the officer. Well, this raises red flags in the officer's mind. The officer goes, if this is how they will talk to me, if this is how they will deal with me, and I'm in uniform and carry a gun, what chance do other individuals that they deal with stand? Is there going to be a fight? Is there going to be a problem? Is there alcohol on board? This is a Terry stop. I need to find out what is going on here. And the trial court agreed at the transcript on page six, lines four through 21. And the problem is, and the reason why we're here, is because somehow between oral argument and the written order, that finding dropped off the radar. And without that finding, without the rudder to guide the ship as it were, the trial court reached an erroneous finding. Let me kind of focus on the areas where I'm struggling. Obviously, you have disputes as to the facts, but at the stage where we are, the plaintiffs, I'll call them for this purpose, they get all inferences in their favor when we're kind of going through the saucier analysis, determining a constitutional violation. The situation that I have on the one is the wrap on the back of the head. How do you get past that with whether under the circumstances, because there is testimony to that effect, that there's the wrap on the back of the head. So how do you get past that on the excessive force? And also, too, on that, I think that same transaction, you also have the kicking out of the legs, and that's described in different, a little bit in different ways. But we have to go with the way that the plaintiffs see it in order to analyze this. I think I would be inclined to agree with you that they would be entitled to qualified immunity on that, but for the wrap on the back of the head. So the kicking out on the, you know, when they're doing the search and all of that, I don't think that that in and of itself would come to the excessive force. But can you really parse that out? I mean, is it just, do you have to take all of that in context? And then how do you get past that wrap in the back of the head? Your Honor, here's why I think my clients get past that. First of all, I think that the court's ruling on excessive force has to be viewed in context that there was potentially false arrest that was going on here. And the court, the trial court, needed to look at the fact, the way that we view it, that there was a legitimate Terry stop that was going on at this time. Now, you could win all this on trial, but how do you, you know, for purposes at this particular stage, you know, and they're alleging that a wrap in the back of the head that didn't need to be done, how do you get past that? Your Honor, first of all, we contend that there was a lawful Terry stop that was going on at this time. And that's something that needs to be placed in the... Lawful Terry stops allow you to hit people in the back of the head for no reason. Is that correct? Your Honor... Is that your position? No one is saying that if plaintiffs are believed, that if it's assumed true, as we must do... Well, then let's do it. ...that this was the finest moment of law enforcement. Let's not stop talking about Terry. Let's just say, let's say, it is a Terry stop. Let's just assume that. And then he whacks the guy in the back of the head for no reason. Your Honor... You're being asked, how do you get beyond that? Going straight to excessive force, how we get beyond that is, there was no complaint by this plaintiff in the trial court or anywhere else that he suffered any injury, or there were any medical bills that were involved here. In a line of authority, starting with our Supreme Court... Well, but you have to be injured for excessive force as a matter of law. Your Honor, here's what I would cite for you. I mean, an officer could slap me in the face, and I might be fine, but couldn't I still make a claim of excessive force? I mean, I'm not out as a matter of law, am I? Well, I hate to use the court as an example, so not to personalize it, but to state that beginning in Salcier v. Katz, in that case, there was a gratuitous shove. If the plaintiff believed in that case, and they were in front of the Supreme Court, fine, we'll grant you, it was a gratuitous shove. There was no reason for it to happen. But not every push or shove of law enforcement is going to get you into federal court. And that's what the Supreme Court has been saying since 1989 in Graham v. Connor. Some people think that getting slugged is different from being pushed. Strangely enough. I don't think that we have a slug here. Excuse me? I don't think that we have a slug here that produced medical bills, that produced doctors. But what does the plaintiff say? What does the plaintiff say? What does the plaintiff say happened? The plaintiff says that he was slugged in the back of his head, and there was actually no... Okay, so we've got to take that as true at this particular juncture. Absolutely. You could go to a jury, and the jury could say, hey, look, there was a lot going on, and that's not worth it. We didn't get injured, no harm, no foul, and fine in your favor. But here we're at summary judgment. That is true. And we have the South VA case, and we also have the ARPA case. Well, maybe we need to move on to some of the other... I wanted to hear on Melissa, is it Melissa Myers? Michelle Myers. Michelle Myers. Okay. What are the best plaintiff's facts for that, in terms of what she said was going on, in terms of... because I'm going to ask some questions over there, but I have... I'm inclined to think under, you know, with the screaming and the yelling, and you say, get out of the way, and this. What are her best facts for that, that the officers could just move her, and a reasonable officer could think that she was interfering with their investigation at that time? Your Honor, I suppose her best facts is she's standing there watching her boyfriend down in a fracas on the ground with her Mosa Beach officer, and that she has an excuse for being as upset as she was. But viewed from the viewpoint of an officer who's trying to conduct a Terry stop, and who's trying to find out, is there alcohol on board here? Please pay attention to me, Ms. Myers. Please listen to me. I have some questions I want to ask you. The officer at that point, from an objective standpoint, is entitled during the course of... Well, how could the officer think she was... how could a reasonable officer think she was interfering? Your Honor, I think the violation of law came during the course of the Terry stop, when she was asked to move. But he had her arms around... the officer had his arms around her at that point, according to the testimony. So I couldn't understand that issue at all. Your Honor, I would refer you to our opening brief on appeal, where the record is as clear as I think it can possibly be, that the arms did not come around anybody. And this is page 13 of our opening brief on appeal. The arms did not come around anybody until she had been ordered twice to move away from the scene. Okay, that's what the officer said. Okay, but what did she say happened? Your Honor... That's what I have to go on here. Ms. Myers said that. Ms. Myers admitted to that. And again, I refer to the court to the bottom of page 13, where it was pulled from Ms. Myers' own testimony. She says that she admits, and that is the right word, that she was asked twice to move away before the arms come around her and she's handcuffed. And so the reason why this was a good arrest, why they don't have a false arrest claim here, is because this court and California courts have said this court, looking at California law, is during the course of a Terry stop, an officer has the right to ask individuals to move... So Myers admits that she was asked to move twice, not the officer's testimony. I'm having trouble with that. I'm looking at your page 13, and it says, Officer Freelo just engulfed me, and he never said you're arrested or anything. He said you need to come with me. So you're saying that the officer Freelo just engulfed me, which seemed to be explained by the bear hug, was not, we should not understand that to be a bear hug? It was not a bear hug, but it was not a handcuffing. She was not handcuffed. Right, but he put his arms around her. Yes. Okay, so you agree that she's testifying that he put his arms around her before he said you need to come with me. Yes, and even with that, she still is not moving with the officer. Where is her testimony that she was asked to move twice? Your Honor, it's at page 13 of the appellant's opening brief. So he's got his arms around her and says you need to come with me, and she, as she's being held in the bear hug, says why I didn't do anything, and then he says you need to come with me. Is that what you're saying is her disobedience to his orders? Yes, when she was under a Terry stop and the officers are trying to move her, she's resisting him by not working with him, and so she's asking questions. Why do I need to do this? Why do I need to come with you? Okay, you're in overtime, but if the panel has additional questions, that's what I need to know. Of course, and I do not. All right, the panel doesn't. I'll give you one minute for rebuttal. Your Honor, thank you. Good morning. May it please the Court. I am Tom Beck representing the appellees in this case. I think the Court has hit on the Myers issue, and that is found in the excerpts of record at page 363. All right, I want to know, though, in terms of that this is, for me, this is that I'm struggling with this in terms of did Myers say she was asked to move twice before that happened? Negative. Here's the exchange. From her perspective, I want to know what she said. She said that she was watching what was happening to her fiancé on the ground, desperate because of the brutality of it all, and the officer, Frelow, is the cop we're talking about here, stood before her to try to prevent that. The fiancé is taken from the ground. But you're saying, okay, from her standpoint, where is she standing? What things is she saying? What kind of fracas is she? Is she yelling? She's crying. She's hysterical. What else is going on? Well, she and Mr. Silver are standing side by side. Officer Frelow was moving his body from side to side. This is their version of it. From side to side to prevent them from seeing what what Officer Lewis doing, actually choking, seriously choking the Mr. Nolan on the ground. She's desperate to ask him for help. Do something. Do something. Once that situation is off the ground, she then is told by the officer, he grabs her first. And this is what the court found. And she agreed. Grabs her first. And the policeman says, quote, you need to come with me. Her. Why? I didn't do anything. Close quote. You need to come with me. I don't understand. Close quote. That's it. That's the interference that they claim was probable cause for the 148 arrest. Any reasonable police officer would have known that that's not a violation of 148 as California interprets that section. It is not any minuscule delay, interruption or interference, if you will. There's ample case law that the case that was before the court now before you that says that doesn't amount to 148. And no reasonable police officer, as our court determined, could believe that that was a 148. That's it. That issue goes to the jury. And the denial of qualified immunity on that ground alone, I think, should answer the question. Okay. Let me get to the excessive force issue. The issue would be, is that sort of strike to the back of the head in the context of this melee and this search of Mr. Silva, I believe it was, does that fall below some de minimis threshold where it's not going to constitute excessive force? I believe that's the argument that's being made. That is the argument that's being made. And the answer is under these facts, under these circumstances, it was gratuitous brutality. It was just a strike, a mean strike to the head. And how do we know that? Because this is an answer to an earlier question. The officer took this man who had no reason to be taken into any kind of a custodial setting. He was just a witness. He was watching Mr. Silva, turned him around, instructed him to place his feet beside beside one another. And he puts his legs. We called it in the record. He called it jumping jack distance apart. And the officer says something to him and he turns around, says they're spread just as quick as that. He kicks that foot so that the shoe flies six feet in another direction and then bangs him in the back of the head with something hard. He didn't know what it was. Totally gratuitous, totally mean. And how do we know that he's not entitled to qualified immunity? Because he lied about he the gentleman that walked up. This is you'll see from the record if you analyze it. Witnesses, third witness walked up and handed Mr. Silva a business card, said, call me. I'll be a witness for you. And Officer Lewitt took that card away and later denied that he ever had it. Why, if he genuinely believed that that use of force, either one of them was reasonable, would he do that? The answer is simple. He knew it was unreasonable and that's all the standard we have to go by. And the court correctly understood that. He doesn't have to have a physical lasting injury. You know, there's a you stick a gun in a person's face under the Robinson School of Thought in the Ninth Circuit. And that's any reason if it's not reasonable to do that and frighten the devil out of the plaintiff. That's an excessive act, an act of excessive force. The one that testified that the shoe went flying. It was Mr. Silva. Mr. Silva's testimony indicated that the officer kicked him with such force that his shoe actually flew away and he ended up in jail without a shoe. Any other questions that I might be able to respond to? The thing I would point out in my remaining time is in order to get qualified immunity to have jurisdiction to come here, they've got to present a qualified argument to the court. And so that is case. That wasn't the case. So that has got no standing here because his qualified immunity wasn't even addressed by this by the trial court. He came in and said, I'm entitled to be dismissed from this case because I didn't touch them. But he was the supervisor. This was a party's personal participation argument. And the court would genuinely recognize that. I said, you know, you're not asking me for qualified immunity. You have to say that you did participate in what you believed at the time was reasonable. None of that is before the court. It's not in this record. It wasn't there. That's also true of the arguments being made by all of the defendants against the conspiracy and malicious prosecution claim. They claim that there were other defenses essentially arguing there was an insufficiency of evidence. Trial court recognized that and didn't rule on the qualified immunity issue as they're trying to renew before you. It has to be four square on the on the two parts that have to be addressed. And they did not do that. So to the extent that qualified immunity was denied, the court correctly denied qualified immunity because there was first disputed issues of fact and no. And the court's determination that under these circumstances, given the way the plaintiffs say it, there was not probable cause. No reasonable police officer could have possibly believed it, either that they were intoxicated as the state court level requires or that they violated 148 as as that's interpreted by state law. And as to the rest, they just didn't ask for it. And hence, they shouldn't be entitled to have it here. That's really it. I have nothing for that. We don't seem to appear to have further questions. Thank you for your argument. Your Honor, just briefly, if I can have one minute. I understand. The two requests for Myers to move are reflected on the first paragraph of page 10 of our opening brief on appeal. Those are there. I just wanted to flag. We're in the record. Are they not? I don't care about your opening brief. Where are they in the record? Your Honor, they are at the deposition of Michelle Myers. And the sites are there. And they were not questioned by the plaintiff down in the trial court when they had an opportunity to do that. The other point that I'll make is the Arping case and others cited at page 22 of our briefing. And I'm quoting now, allegations without medical records or other evidence of injury are insufficient to establish excessive force. And there are district court cases also from the Ninth Circuit dated 2005-2007 that say essentially the same thing, citing to Ninth Circuit and Supreme Court case law. The other point that I'll make with regard to the shoe flying, very dramatic, but I don't see that anywhere in the record. And that was a problem down in the trial court. Did someone testify to that? Not that I'm seeing. I don't see it in the record. It certainly wasn't pinpointed to the trial court or to this court in any briefing that I've seen. So it is a persistent problem that we had in the trial court. All right. Well, we'll have to check that then. Okay. That concludes the argument on this case. The matter will stand submitted.
judges: Fernandez, Callahan, Ikuta